IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

U.S. DISTRICT COURT
DISTRICT OF WYOMING

2014 DEC 5 PM 4 17

STEPHAN HARRIS, CLERK
CHEYENNE

|  |  |
|---|---|
| MONICA MORMAN, M.D., an individual,<br><br>      Plaintiff,<br><br>      v.<br><br>CAMPBELL COUNTY MEMORIAL HOSPITAL, ROBERT MORASKO, SARA HARTSAW, M.D., NANCY TRAVER, HARVEY JACKSON, JOE HALLOCK, ALAN L. MITCHELL, M.D., GEORGE DUNLAP, and BROOK BAHNSON, in their individual and official capacities,<br><br>      Defendants. | Case No. 13-CV-243-ABJ |

---

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

---

Defendants' "Motion to Dismiss" (Doc. No. 8), Plaintiff's opposition (Doc. No. 12), and Defendants' reply (Doc. No. 14) have come before the Court for consideration. After reviewing the parties' submissions, the applicable law, and being fully advised, the Court finds that the motion should be **GRANTED** for the reasons stated below.

**BACKGROUND**

On October 25, 2013, Plaintiff filed a Complaint alleging a claim for relief under 42 U.S.C. § 1983. Doc. No. 1. On January 27, 2014, Defendants filed a Motion to

Dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6). Doc. No. 8. Plaintiff responded to the motion on February 13, 2014. Doc. No. 12. Defendants filed their reply on February 20, 2014. Doc. No. 14. The Court finds that these matters are fully brief and are ripe for disposition.

On November 24, 2014, Plaintiff filed a Petition for Writ of Mandamus with the Tenth Circuit Court of Appeals. Doc. No. 17. The Tenth Circuit has not yet ruled on Plaintiff's petition.

## STANDARD OF REVIEW

In *Ashcroft v. Iqbal*, the Supreme Court articulated a two-step approach for district courts to use when considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See* 556 U.S. 662, 679 (2009). First, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id. Iqbal* clarified that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. The Court has stated that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

2

the defendant is liable for the misconduct alleged." *Id.* Plausibility lies somewhere between possibility and probability; a complaint must establish more than a mere possibility that the defendant acted unlawfully but the complaint does not need to establish that the defendant probably acted unlawfully. *See id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## DISCUSSION

In her Complaint, Plaintiff, Dr. Monica Morman, alleged the following: Plaintiff is a board-certified orthopedic surgeon who specializes in upper extremity surgeries. Plaintiff graduated from medical school in 1997. Plaintiff completed her orthopedic surgery residency in 2002. Plaintiff became board-eligible (American Board of Orthopaedic Surgery) in 2002 and became board-certified (American Board of Orthopaedic Surgery) in orthopaedic surgery in 2005. Plaintiff completed a hand-surgery fellowship in 2003 and received her Certification of Additional Qualification (CAQ) in hand surgery in 2008. Plaintiff also completed a shoulder fellowship in 2009.

In 2003, Plaintiff became employed as an orthopedic surgeon at Powder River Orthopedics & Spine, P.C. (PROS), located in Gillette, Wyoming. At the time, PROS was owned by four orthopedic surgeons, Drs. Nate Simpson, Hans Kioschos, John Dunn, and Gerald Baker. In 2008, Plaintiff was offered a shoulder fellowship at Massachusetts General Hospital with the Harvard Shoulder Service. The Fellowship was to commence

in August 2008 and be completed in July 2009. Plaintiff accepted the fellowship and terminated her employment and partnership with PROS in June 2008.

Upon completion of her shoulder fellowship, Plaintiff returned to Gillette, Wyoming to resume her practice as an orthopedic surgeon. However, instead of returning to PROS, Plaintiff decided to become an employee of Campbell County Memorial Hospital (CCMH). As a result, Plaintiff alleges she "became a direct competitor of the PROS physicians." Doc. No. 1., p. 4.

On September 1, 2009, CCMH and Plaintiff entered into an employment agreement. Under the terms of this agreement, Plaintiff was to receive both a base salary and bi-annual bonus payments that were based on her productivity. Specifically, Plaintiff was to receive a bonus payment equal to fifty-five percent (55%) of all gross collections that CCMH received for Plaintiff's services in excess of $450,000.00 during each bonus period.

After entering into the agreement, Plaintiff began working in CCMH's orthopedic clinic. Plaintiff alleges that "[f]rom the beginning, CCMH has operated the orthopedic clinic in a manner that has placed [her] at a competitive disadvantage with the surgeons at PROS." *Id.* at 4. Plaintiff alleged six examples of CCMH's poor management of the clinic.

First, soon after Plaintiff's employment began, CCMH changed the name of the clinic from "Orthopedic Specialists of Wyoming–a CCMH Clinic" to "Campbell County Clinic – Orthopedics." Plaintiff objected to the use of the phrase "County Clinic" because county hospitals and clinics are often associated with free clinics for the indigent

with substandard care. Plaintiff further alleged that given the large number of newcomers to Campbell County who are unfamiliar with CCMH and its history, the decision to change the name of the clinic caused many potential patients to choose the PROS physicians over her. In addition to the name change, Plaintiff's unique logo was exchanged for the branding of the Campbell County Clinics. Plaintiff alleges that "[s]ince their employment in 2012, the physicians of Powder River Orthopedics and Spine have been allowed to maintain the name of their private practice as well as the logo of their private practice." *Id.* at 5.

Second, Plaintiff is not allowed to self-manage or participate in the management of the clinic and selection of staff. CCMH employed and continues to employ clinic staff who Plaintiff has asked to be terminated or transferred. Plaintiff alleges that by refusing to allow her to select and manage her clinic staff, "CCMH has caused some patients and their family members to choose the PROS physicians for their future orthopedic care." *Id.*

Third, CCMH refused to hire a full-time office manager for the clinic. As a result, the clinic's shared office manager was often away from the clinic and unable to supervise staff, timely respond to patients, or otherwise perform her administrative duties effectively. Plaintiff's alleges "[t]his caused the clinic to become unorganized and inefficient, which in turn caused some patients to choose the physicians at PROS because PROS is able to present itself and operate in a much more professional manner." *Id.* Eventually, an orthopedic clinic supervisor was named but was not given the same autonomy as other clinic managers.

Fourth, CCMH has not provided effective advertising for Plaintiff or the orthopedic clinic, despite being contractually obligated to do so. Plaintiff alleges that "[t]his is in contrast to PROS, which has always advertised heavily for its physicians." *Id.* at 6.

Fifth, CCMH has not provided the clinic with its own onsite billing personnel. *Id.* Rather, CCMH uses a central billing office which employs billing coders for all of the hospital's various clinics. Plaintiff alleged that "[b]y not allowing the orthopedic clinic to oversee its own billing and collections, CCMH has caused the clinic to lose money through improper billings and, at times, the failure to bill at all for some procedures." *Id.* Furthermore, Plaintiff alleged "[t]his is in contrast to PROS, which had its billing and collections staff located directly in its clinic under the direct supervision of the PROS' [sic] physicians." *Id.*

Finally, CCMH failed to provide adequate office space for the clinic. Plaintiff alleges that "[i]nstead of creating a modern and comfortable office space that is inviting to patients, CCMH has located the clinic in various spaces that are not sufficient for the practice." *Id.* at 7. Furthermore, "the office spaces have not been inviting to patients because they create a crowded, disorganized appearance." *Id.* Plaintiff made a number of requests to CCMH to address the issue of inadequate office space and those requests were substantially ignored or disregarded. Plaintiff alleges that the "inadequate office space has caused some patients to choose the physicians at PROS over [her] for their orthopedic needs because PROS is located in a spacious, comfortable and organized office space which creates a more professional appearance." *Id.*

Plaintiff attempted to resolve all of the foregoing problems by discussing proposed changes with CCMH's chief executive officer, Robert Morasko. She has also addressed the CCMH's Board of Trustees at their monthly public meetings and has written letters to the individual Board Members. However, Mr. Morasko and CCMH's Board of Trustees ignored Plaintiff's proposals and refused to make any significant changes to the manner in which CCMH managed the clinic.

As a result of the failure to adequately manage the clinic, Plaintiff alleges that she was placed "at a competitive disadvantage with her competitors at PROS" and as a result "CCMH has reduced the amount of revenue that [she] is able to generate for the hospital." *Id.* at 7. By placing her at a competitive disadvantage, the bonus payments Plaintiff would have been able to earn under her employment agreement were reduced.

On December 1, 2011, Plaintiff and CCMH renegotiated the employment agreement after a dispute arose over the value of the bonus payments. Under the new agreement, Plaintiff was still entitled to a base salary and bi-annual bonus payments. The new agreement increased the amount of Plaintiff's base salary and contained a higher threshold of revenue that Plaintiff would have to reach to maintain her base salary before she earned her bonus. In contrast, the physicians of PROS are not held to a certain collection level to maintain their current base salary. No other employed surgeons with base salaries at the same or higher percentiles are held to a threshold of revenue to maintain their current base salary.

Plaintiff's contract renegotiation with CCMH was well publicized by CCMH's Board of Trustees and its CEO. The amount of her compensation was reported to local

7

newspapers and was the subject of public opinion articles for several months. The publicity was emotionally taxing and embarrassing for Plaintiff. Plaintiff further alleges that the publicity cause her to suffer a loss of patients.

In May 2012, CCMH's Board of Trustees and its CEO entered into an agreement with three physician owners of PROS, Drs. Simpsons, Kioschos, and Dunn, pursuant to which these physicians would become employees of CCMH. This negotiation was never publically discussed. These hires did not follow the standard recruitment guidelines through the Physician Recruitment and Retention Committee as other physician hires have. The contracts were approved at the May 2012 Board meeting without any meaningful public discussion. Plaintiff alleges that "the contracts were purposely approved while [she] was out-of-town on a family vacation, which prevented her from making any public comments regarding the contracts." *Id.* at 9. Plaintiff further alleges that because the PROS physicians were not subject to the same public scrutiny she was, they did not lose patients.

As a part of the agreement, the PROS physicians and CCMH's Board of Trustees and its CEO agreed to have CCMH purchase the PROS office building for $1.84 million. They also agreed to have CCMH purchase the doctor's radiology practice for approximately $4 million and to have CCMH purchase the radiology equipment and assume their MRI lease.

CCMH's Board of Trustees and its CEO did not require Drs. Simpson, Kioschos, and Dunn to move their clinic into the same hospital building where Plaintiff's clinic was located. They were not required to operate out of an unappealing and inefficient office

space. They were allowed to operate their clinic out of the same modern office building they had always worked in at PROS, and which was now owned by CCMH.

CCMH's Board of Trustees and its CEO did not require Drs. Simpson, Kioschos, and Dunn to change the name of their clinic. They were allowed to continue to operate their clinic under the name "Power River Orthopedic and Spine." Plaintiff alleges that as a result, "these doctors did not suffer any of the negative stigmatization associated with being a county-owned clinic." *Id.* at 10.

CCMH's Board of Trustees and its CEO gave Drs. Simpson, Kioschos, and Dunn complete autonomy with respect to whom they would hire for their office staff. CCMH's Board of Trustees and its CEO agreed to pay Drs. Simpson, Kioschos, and Dunn an annual $100,000.00 management fee as compensation for managing the practice. The management fee is in addition to the wages and benefits earned by the office staff, all of which are paid by CCMH. This arrangement is different than the one between CCMH and Plaintiff, where CCMH maintains all managerial authority and make all the decisions as to who will be employed by the clinic.

CCMH's Board of Trustees and its CEO had CCMH continue to pay for the advertising campaign that Drs. Simpson, Kioschos, and Dunn used when they operated the clinic. CCMH has provided almost no advertising for Plaintiff's clinic.

Drs. Simpson, Kioschos, and Dunn have also been allowed to maintain onsite radiology services for their patients. Despite several requests, Plaintiff has never been provided with onsite radiology services. Plaintiff alleges this "has led to inefficiencies in

the clinic, more time required for appointments, and frustration to patients," which in turn "led to a subsequent loss of patients and revenue." *Id.* at 10.

Drs. Simpson, Kioschos, and Dunn have the privilege of interpreting, and billing for the interpretation, radiographs done on their own patients. Plaintiff requested this privilege when she was hired in 2009 and many other times but was denied that privilege. Plaintiff alleges that as a result of this, she "lost patients, and subsequently, revenue." *Id.* at 11. After Drs. Simpson, Kioschos, and Dunn were hired, Plaintiff again addressed the Board of Trustees about this privilege. Several months after Drs. Simpson, Kioschos, and Dunn were hired, Plaintiff was allowed the same privilege.

Plaintiff alleges now that Drs. Simpson, Kioschos, and Dunn are employed by CCMH, the differential treatment with respect to marketing, office conditions, and management authority has continued and places Plaintiff "at a competitive disadvantage with the other three doctors." *Id.* at 11. The differential treatment reduced the bonus payments Plaintiff has been able to earn.

Under her employment agreements, Plaintiff has been prohibited from establishing or having an ownership interest in any imagining center or surgery center that competes with CCMH. Plaintiff has been required to turn down certain investment opportunities, including an offer to purchase an ownership interest in a surgery center in Gillette, Wyoming. Plaintiff has repeatedly requested that CCMH waive these provisions of her employment agreement. CCMH and the Board of Trustees have denied Plaintiff's requests.

When Drs. Simpson, Kioschos, and Dunn became employees of CCMH, the CCMH's Board of Trustees and its CEO did not prohibit the doctors from having any ownership interests in competing imaging and surgery centers. Rather, the three doctors were allowed to maintain their ownership interest in Powder River Surgery Center after they were hired. Powder River Surgery Center is located in Gillette, Wyoming and competes directly with CCMH.

As a result of CCMH's decision not to allow Plaintiff to invest in competing surgery centers, Plaintiff must perform all of her surgical procedures at CCMH. This results in higher costs for those patients who could have their procedures performed in a lower-cost surgical center. Plaintiff alleges that as a result, "the PROS physicians have a competitive advantage over [her] because the PROS physicians can perform their surgical procedures in their own surgical center at a lower cost to their patients." *Id.* at 12.

Plaintiff is unable to perform her surgeries as efficiently and conveniently as Drs. Simpson, Kioschos, and Dunn. Unlike those doctors, who have control over the utilization of their surgical center, Plaintiff must schedule her procedures at a time that does not conflict with the hospital's schedule or the schedules of other surgeons. Plaintiff alleges that as a result "the PROS physicians have a competitive advantage over [her] because the PROS physicians can schedule surgeries at times that are more convenient for their patients, and with a wider range of available operating room times.

Plaintiff further alleges that because of Defendants conduct, she "has been placed at a competitive disadvantage with the PROS physicians with respect to her ability to attract new partners to her clinic." *Id.* at 13. For example, one fifth-year resident choose

to join the physicians at PROS, "presumably because it provided him with a better opportunity to attract new patients and earn more income." *Id.*

As a result of the differential treatment of Plaintiff and Drs. Simpson, Kioschos, and Dunn, Plaintiff alleges that CCMH's Board of Trustees and its CEO discriminated against her with respect to her compensation and the terms, conditions, and privileges of her employment.

## I. Plaintiff's Claim for Relief

As an initial matter, the Court must determine what Plaintiff is claiming. Plaintiff alleged she suffered gender discrimination in violation of her right to equal protection pursuant to 42 U.S.C. § 1983. Plaintiff alleged that "the individual defendants discriminated against Dr. Morman with respect to her compensation and the terms, conditions, and privileges of her employment because of Dr. Morman's female gender." Doc. No. 1, p. 15. She also alleged "the individual defendants deprived Dr. Morman of rights and privileges secured and protected by the Constitution and laws of the United States, including the right to equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution."

There are two types of discrimination claims recognized under these circumstances: disparate impact and disparate treatment. Disparate treatment arises where there has been intentional discrimination. *See Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). Disparate impact, on the other hand, arises not where there has been intentional discrimination, but where policies or practices that are not intended to discriminate have a disproportionally adverse effect on a protected class. *See id.*

This distinction was not addressed in the briefing on the Motion to Dismiss. *See* Docs. No. 8, 9, 12, 14. However, Plaintiff alleged the following in her Complaint: "Each of the acts of the individual defendants alleged in this Complaint constituted an official policy or custom of CCMH and/or deliberate indifference on the part of CCMH." Doc. No. 1, p. 14. Accordingly, the distinction deserves some attention.

As explained above, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. Plaintiff's allegation that the acts of the individual defendants alleged in the Complaint constituted an official policy or custom is no more than a conclusion; and therefore, is not entitled to the assumption of truth. Even assuming the veracity of Plaintiff's other allegations, the allegations do not plausibly give rise to an entitlement to relief under a theory of disparate impact.

This conclusion is supported by the fact that Plaintiff seems to have abandoned the disparate impact theory of her case by not arguing it in response to Defendant's Motion to Dismiss. *See* Doc. No. 12 ("In her Complaint, Dr. Morman claims that the defendants violated her constitutional right to equal protection *when they refused to provide her* with the same employment benefits that were provided to the other male orthopedic surgeons employed by Campbell County Memorial Hospital." (emphasis added)). Accordingly, the Court will proceed to consider Plaintiff's claim as one for intentional discrimination, also known as disparate treatment, and not disparate impact.

## II. Immunity

The second question the Court must address is whether Defendant Board Members and Defendant Morasko are immune from suit in their individual capacities. Plaintiff brought suit against CCMH and Robert Morasko, Sara Hartsaw, Nancy Tarver, Harvey Jackson, Joe Hallock, Alan L. Mitchell, George Dunlap, and Brook Bahnson (Defendant Board Members) in their individual and official capacities. Doc. No. 1.

Defendants argue that absolutely legislative immunity renders all Defendant Board Members in their individual capacities immune from suit. Doc. No. 9. Defendants further argue that all Defendant Board Members and Defendant Morasko are immune from suit and liability in their individual capacities under qualified immunity. Doc. No. 9. The Court will address each argument in turn.

### A. Defendant Board Members are not entitled to absolute legislative immunity.

The first issue with regard to immunity is whether Defendant Board Members are absolutely immune. The United States Supreme Court has held "that local legislators are absolutely immune from suit under § 1983 for their legislative activities." *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998). The question here, however, is whether Defendant Board Members were engaged in legislative activities when they approved the negotiated terms of the acquisition at issue. As the Tenth Circuit stated, "In order to determine whether Defendants should be cloaked in legislative immunity, we look to the function that [they] were performing when the actions at issue took place, and we examine the nature of those actions." *Kamplain v. Curry Cnty. Bd. of Com'rs*, 159 F.3d 1248, 1251

14

(10th Cir. 1998) (citing *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998); *Forrester v. White*, 484 U.S. 219, 224 (1988)). The Tenth Circuit further explained that "at its core, the legislative function involves determining, formulating, and making policy." *Id.*

Here, the decision to approve the terms of the acquisition at issue cannot fairly be characterized as determining, formulating, or making policy. Rather, the decision is more appropriately characterized as an executive action. Accordingly, the Court finds that Defendants Board Members are not entitled to absolute legislative immunity.

## B. Defendant Board Members and Defendant Morasko are entitled to qualified immunity.

The second issue with regard to immunity is whether Defendant Board Members and Defendant Morasko are protected from suit and liability in their individual capacities by qualified immunity. Defendants argue that in order to overcome qualified immunity, Plaintiff bears the burden of establishing (1) that each Defendant's actions violated a constitutional right and (2) that the right violated was clearly established at the time of the alleged conduct. Doc. No. 9. Defendants contend that Plaintiff has failed to both allege a plausible claim that she was subject to gender discrimination in violation of her equal protection rights and that at the time the right was allegedly violated, Defendants did not violate clearly established federal law. *Id.* Plaintiff argues that she has sufficiently alleged a plausible claim of gender discrimination and that "[i]t has been plain in this country for quite some time that gender-based discrimination in the workforce by a governmental entity violates the equal protection clause." Doc. No. 12.

Generally, "qualified immunity shields public officials . . . from damages actions unless their conduct was unreasonable in light of clearly established law." *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008) (quoting *Elder v. Holloway*, 510 U.S. 510 (1994)). As the Tenth Circuit stated, "[a]fter a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff." *Medina v. Cram*, 252 F.3d 1124, 1148 (10th Cir. 2001). The plaintiff has a two-part burden. First, the plaintiff must establish "that the defendant's actions violated a constitutional right or statutory right." *Id.* (quoting *Albright v. Rodriquez*, 51 F.3d 1531, 1534 (10th Cir. 1995)) (internal quotation marks omitted). Second, if the plaintiff established a violation of a constitutional or statutory right, the plaintiff "must then demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct." *Id.* (citing *Albright*, 51 F.3d at 1534).

As the United States Supreme Court explained,

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 535 n.12 (1985)). The inquiry into whether an official violated a clearly established right "must be undertaken in light of the specific context of the case, not a broad general proposition." *Saucier* v. Katz, 533 U.S. 194, 201 (2001). Furthermore, "A right is 'clearly established' if Supreme Court or Tenth Circuit case law exists on point or if the 'clearly established weight of authority

from other circuits' found a constitutional violation from similar actions." *Peterson v. Jensen*, 371 F.3d 1199, 1202 (10th Cir. 2004).

As discussed below, the Court finds that Plaintiff failed to set forth a plausible claim of gender discrimination. Accordingly, the Court will not address the arguments regarding whether Plaintiff has sufficiently alleged that each Defendant's actions violated a constitutional right. However, because qualified immunity is not only immunity from liability but also "immunity from suit," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Court will address the question of whether Defendants' alleged conduct violated a clearly established right at the time they acted.

Tellingly, Plaintiff did not point the Court to any precedent of the United States Supreme Court or the Tenth Circuit addressing a constitutional violation from similar actions. Plaintiff cites to a single decision from the United States District Court, District of Kansas. *Polson v. Davis*, 635 F. Supp. 1130 (D. Kan. 1986). In *Polson*, the district court was considering whether the plaintiff's termination violated a clearly established right. *Id.* at 1136. Here, the claim of gender discrimination does not concern whether Plaintiff was terminated in violation of her equal protection rights. Rather, the claim of gender discrimination concerns whether Plaintiff was discriminated against with respect to her compensation and the terms, conditions, and privileges of her employment when Defendants entered into an arms-length transaction to purchase an existing practice and hire three male doctors. The factual allegations in the present case are vastly different than those in *Polson*.

Plaintiff merely argues that gender discrimination violates a constitution right. While none would disagree that gender discrimination violates the Equal Protection Clause, that is not the question here. The question is whether the law was clearly established at the time of Defendants conduct such "that a reasonable official would understand what he is doing violates that right." *Hope*, 536 U.S. at 739 (quoting *Anderson*, 483 U.S. at 640) (citing *Mitchell*, 472 U.S. at 535 n.12). Plaintiff has not met her burden. Accordingly, the Court finds that Defendant Board Members and Defendant Morasko are protected from suit and liability in their individual capacities by qualified immunity.

### III. Plausibility of Plaintiff's Claim for Relief

The third question the Court must address is whether Plaintiff plead a plausible claim for relief or whether the Court should grant Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff urges the Court to apply the pleading standard articulated by the United States Supreme Court in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2006) ("This Court has never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss."). Plaintiff argues that her Complaint should not be evaluated under the *McDonnell Douglas* burden shifting test and need only set forth a short and plain statement of her claim. Plaintiff's argument is "as understandable as it is mistaken." *Barrett v. Salt Lake County*, 754 F.3d 864, 867 (10th Cir. 2014).

Plaintiff's argument ignores the recent changes to the pleading standards following

the United States Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly* and

*Ashcroft v. Iqbal*. In *Khalik v. United Air Lines*, the Tenth Circuit discussed the changes

in the law and explained the standards under which pleadings should be evaluated in the

employment discrimination context:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Recently, the Supreme Court clarified this pleading standard in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009): to withstand a Rule 12(b)(6) motion to dismiss, a complaint must contain enough allegations of fact, taken as true, "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955. A plaintiff must "nudge [her] claims across the line from conceivable to plausible" in order to survive a motion to dismiss. *Id.*

> \* \* \*

> While the 12(b)(6) standard does not require that Plaintiff establish a prima facie case in her complaint, the elements of each alleged cause of action help to determine whether Plaintiff has set forth a plausible claim. *See Swierkiewicz*, 534 U.S. at 515, 122 S.Ct. 992; *see also Twombly*, 550 U.S. at 570, 127 S.Ct. 1955. Thus, we start by discussing the elements a plaintiff must prove to establish a claim for discrimination . . . .

> A plaintiff proves a [claim of intentional discrimination] either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Crowe v. ADT Sec. Servs. Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011). Under *McDonnell Douglas*, a three-step analysis requires the plaintiff first prove a prima facie case of discrimination. *See Garrett v. Hewlett–Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002). . . . The burden then shifts to the defendant to produce a legitimate, non-discriminatory reason for the adverse employment action. *See Garrett*, 305 F.3d at 1216. If the defendant does so, the burden then shifts back to the plaintiff to show that the plaintiff's protected status was a determinative factor in the employment decision or that the employer's explanation is pretext. *Id.*

671 F.3d 1188, 1191, 1192–93 (10th Cir. 2012).[1]  The Tenth Circuit concluded that "while Plaintiff is not required to set forth a prima facie case for each element, she is required to set forth plausible claims.  Thus, we start by discussing the elements a plaintiff must prove to establish a claim for discrimination . . . ." *Id.* at 1193.

There is some difficulty in determining what elements are at issue in the present case.  The Tenth Circuit appears to apply the same standards for a claim of disparate treatment under § 1983 as it does under Title VII.  *See Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991); *see also Stewart v. Oklahoma ex rel. Oklahoma Office of Juvenile Affairs*, 2014 WL 4746296, *1 n.2 (10th Cir. Sept. 25, 2014) (unpublished) ("[t]he same elements apply to disparate treatment claims under Title VII, § 1981, and § 1983, all of which are subject to the *McDonnell Douglas* analysis.").  However, "the articulation of a plaintiff's prima facie case may well vary, depending on the context of the claim and the nature of the adverse employment action alleged." *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005).

--------

[1] Recently, in dicta, the Tenth Circuit stated the following:  "In fact, *McDonnell Douglas* today serves only a narrow function.  It does not create a pleading requirement . . . ." *Barrett v. Salt Lake County*, 754 F.3d 864, 867 (10th Cir. 2014).  Because the *Barrett* Court was considering whether *McDonnell Douglas* applies to a post-trial motion for judgment as a matter of law and not how *McDonnell Douglas* applies to a 12(b)(6) motion to dismiss, this Court will apply the standard as articulated by the Tenth Circuit in *Khalik*. *See Khalik*, 671 F.3d at 1192–93.

Plaintiff brought her claim of disparate treatment against Defendants under 42 U.S.C. § 1983 alleging a violation of the Equal Protection Clause of the Fourteenth Amendment. Doc. No. 1. In pertinent part, section 1983 provides the following:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. As the Tenth Circuit explained, "[t]he Equal Protection Clause prohibits state and local governments from treating *similarly situated persons* differently." *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 949 (10th Cir. 2003) (emphasis added) (citing *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439–41 (1985)); *see also Ney v. City of Hoisington, Kansas*, 264 F. App'x 678, 683–84 (10th Cir. 2008) (unpublished).

Plaintiff urges the Court to apply the *McDonnell Douglas* standard from *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007).[2] There the Tenth Circuit was

---

[2] Confusingly, Plaintiff argues that "[D]efendants' analysis regarding the sufficiency of Dr. Morman's Complaint is severely flawed because it is based on the evidentiary standard discussed in *McDonnel Douglas* [sic]." Doc. No. 12, p. 5. Then

considering a case involving the issuance of written warnings. *Id.* In that context, the

Tenth Circuit applied the following standard: "[A] prima facie case of discrimination

must consist of evidence that (1) the victim belongs to a protected class; (2) the victim

suffered an adverse employment action; and (3) the challenged action took place under

circumstances giving rise to an inference of discrimination." *Id.* (citing *Sorbo v. United*

*Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir. 2005)).

Defendants urge the Court to apply the *McDonnell Douglas* standard from *Orr v.*

*City of Albuquerque*. 417 F.3d 1144, 1149 (10th Cir. 2005). There the Tenth Circuit was

considering actions related to parental and pregnancy leave. *Id.* at 1150. In *Orr*, the

Tenth Circuit applied the following standard: "To make out a prima facie case of

discrimination, the female Plaintiffs must demonstrate (1) membership in a protected

class, (2) adverse employment action, and (3) disparate treatment among similarly

situated employees." *Id.* (citing *Trujillo v. Univ. of Colorado Health Sciences Ctr.*, 157

F.3d 1121, 1215 (10th Cir. 1998)).

Here, Plaintiff alleged the following: "The individual defendants discriminated

against Dr. Morman with respect to her compensation and the terms, conditions, and

privileges of her employment because of Dr. Morman's female gender." Doc. No. 1, p.

14–15. Plaintiff further alleged, "The acts of the individual defendants deprived Dr.

Morman of rights and privileges secured and protected by the Constitution and laws of

---

Plaintiff urges the Court to apply the *McDonnell Douglas* prima facie case elements as

set forth in *E.E.O.C. v. PVNF, L.L.C. Id.* at 7.

the United States, including the right to equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution." *Id.* at 15. Based on Plaintiff's allegations and the context of Plaintiff's claim, the Court finds the appropriate standard under which to evaluate the plausibility of Plaintiff's prima facie case is the following: Plaintiff must demonstrate (1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees. *See Orr*, 417 F.3d at 1149.

If Plaintiff is able to establish a prima facie case, then the burden "shifts to the defendant[s] to produce a legitimate, non-discriminatory reason for the adverse employment action." *Khalik*, 671 F.3d at 1193. If Defendants are able to do so, "the burden then shifts back to the plaintiff to show that the plaintiff's protected status was a determinative factor in the employment decision or that the employer's explanation is pretext." *Id.*

Here, there is no dispute that Plaintiff is a member of a protected class. There are, however, disputes about whether Plaintiff suffered an adverse employment action and whether Plaintiff was treated differently than similarly situated employees. The Court assumes, without deciding, that Plaintiff has alleged a plausible claim that she suffered an adverse employment action. However, the Court finds that Plaintiff has not alleged a plausible claim that she was treated differently than similarly situated employees.

In order to plead a plausible claim for employment discrimination, Plaintiff must set forth a plausible claim that she was treated differently than similarly situated employees. *See Orr*, 417 F.3d at 1149; *Rector*, 348 F.3d at 949; *see also Hawn v.*

*Executive Jet Management, Inc.*, 615 F.3d 1151, 1158–59 (9th Cir. 2010) ("[W]e keep sight of the ultimate issue in this case: 'whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin.'") (quoting *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978)). Plaintiff and CCMH entered into an employment agreement in September 2009. Doc. No. 1, p. 4. CCMH and Drs. Simpson, Kioschos, and Dunn entered into an agreement in May 2012, "pursuant to which these physicians would become CCMH employees." *Id.* at 8.

Plaintiff alleged that "[f]rom the beginning, CCMH has operated the orthopedic clinic in a manner that has placed Dr. Morman at a competitive disadvantage with the surgeons at PROS." *Id.* at 4. The Equal Protection Clause does not impose an obligation on public employers to ensure that their employees are not placed at a competitive disadvantage with those of private entities. Any allegation that Defendants placed Plaintiff at a "competitive disadvantage" with private entities, and therefore violated the Equal Protection Clause is simply not a plausible claim for relief.

Plaintiff's allegations of differential treatment become more relevant in May 2012 when CCMH's Board of Trustees and its CEO entered into the agreement with Drs. Simpson, Kioschos, and Dunn. Upon reviewing the allegations and accepting them as true, it becomes apparent that Plaintiff and Drs. Simpson, Kioschos, and Dunn are not similarly situated. The inquiry when considering "whether employees are similarly situated—*i.e.*, whether they are 'similar in all *material* respects,'—is a fact-intensive inquiry, and what facts are material will vary depending on the case." *Hawk v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010) (quoting *Nicholson v. Hyannis Air*

*Serv., Inc.*, 580 F.3d 1116, 1125 (9th Cir. 2009); *accord Lucero v. Sandia Corp.*, 495 F.

App'x 903, 909 (10th Cir. 2012) (unpublished) (quoting *Hawk*, 615 F.3d at 1157) (citing

*Nicholson*, 580 F.3d at 1125; *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir.

2012); *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007); *Moran v. Selig*, 447 F.3d 748,

755–56 (9th Cir. 2006); *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54–55 (2d Cir. 2001)).

Here, the relevant facts concern the context surrounding the execution of

Plaintiff's employment contract and the subject matter of the PROS acquisition, which

included the employment agreements of Drs. Simpson, Kioshos, and Dunn. Plaintiff

started her employment with CCMH following her return to Gillette, Wyoming and her

participation in a fellowship. On the other hand, Drs. Simpson, Kioschos, and Dunn

started their employment with CCMH as part of a multimillion dollar transaction in

which they sold their existing orthopedic surgery and radiology practice to CCMH.

For example, CCMH purchased the PROS Physician's radiology practice and

equipment for $4,000,00.00. Doc. No. 9-1.[3] In exchange for the consideration paid,

---

[3] The relevant contracts were not attached to Plaintiff's Complaint. *See* Doc. No.

1. However, Defendants attached the relevant contracts to their memorandum in support

of their motion to dismiss. *See* Doc. No. 9-1. As the Tenth Circuit explained

> Generally, a court considers only the contents of the complaint when ruling
> on a 12(b)(6) motion. . . . This court has explained that "if a plaintiff does
> not incorporate by reference or attach a document to its complaint, but the
> document is referred to in the complaint and is central to the plaintiff's
> claim, a defendant may submit an indisputable authentic copy to the court
> to be considered on a motion to dismiss."

CCMH received all the assets and CCMH agreed to hire four employees, "three radiation technologists and one mid level provider." *Id.* at 138. CCMH purchased all the assets of PROS for $150,000. *Id.*

CCMH paid an annual management fee of $100,000 for the on-going management of the PROS practice. Doc. No. 9. This fee was created by the Management and Administrative Services Agreement. *Id.* Under the Management and Administrative Services Agreement, a new entity, PROSM, LLC agreed to provide physician practice services to CCMH. *Id.* In exchange for the management fee and other consideration stated in the Management and Administrative Services Agreement, PROSM was required to provide "comprehensive management services" for the medical practice and to "manage the Practice's day-to-day operations." *Id.* PROSM provided to CCMH "all clinical, billing, reception, clerical, administrative, medical records, finance, . . . and other services" for which PROSM billed CCMH. *Id.* CCMH purchased the PROS office building for $1.84 million. *Id.* Drs. Simpson, Kioschos, and Dunn also executed employment contacts with CCMH. *Id.*

When comparing Plaintiff's employment with CCMH and Drs. Simpson's, Kioschos's, and Dunn's employment with CCMH, it becomes apparent that Plaintiff's

---

*Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013) (quoting *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997)). Plaintiff does not dispute the authenticity of the contracts attached to Defendant's Memorandum. Accordingly, the Court will consider the contracts here.

employment is not similar in all material respects to that of Drs. Simpson, Kioschos, and Dunn. Those doctors brought many things to the bargaining table when they were hired that Plaintiff simply did not. In fact, most of the things which Plaintiff complains about—the name of the clinic; selection of employees, billing staff, and office manager; office space for the clinic; radiology services for the clinic; and advertising for the clinic—are things Drs. Simpson, Kioschos, and Dunn brought to the table when they entered into the agreements with CCMH three years after Plaintiff was hired.

The Court finds that Plaintiff has not made factual allegations that plausibly give raise to a claim that she is treated differently than similarly situated employees. Plaintiff argues that "even if Dr. Morman had failed to show that she and the other doctors were not similarly situated, her Complaint would still not be subject to dismissal" because her Complaint should not be evaluated under *McDonnell Douglas*. Doc. No. 12, p. 15. This argument misconstrues the nature of Plaintiff's claim of employment discrimination under the Equal Protection Clause. As explained above, "[t]he Equal Protection Clause prohibits state and local governments from treating *similarly situated persons differently*." *Rector*, 348 F.3d at 949 (emphasis added). Accordingly, because the Court finds that Plaintiff has not alleged a plausible claim that she was treated differently than similarly situated employees, the Court finds that Defendants' motion to dismiss should be granted.

## CONCLUSION

Plaintiff brought suit against Defendants Campbell County Memorial Hospital (CCMH), Robert Morasko in his individual and official capacity, and Sara Hartsaw,

Nancy Traver, Harvey Jackson, Joe Hallock, Alan L. Mitchell, George Dunlap, and Brook Bahnson (Defendant Board Members) in their individual and official capacities. Doc. No. 1. Defendants moved to dismiss Plaintiff's Complaint in its entirety. Doc. No. 8. Defendants asserted absolute and qualified immunity for the claim asserted against them in their individual capacities. The Court finds Defendant Board Members are not protected by absolute immunity but Defendant Morasko and Defendant Board Members are protected by qualified immunity. Defendants also asserted that Plaintiff failed to state a claim upon which relief can be granted. Accepting Plaintiff's allegations as true, the Court finds that Plaintiff has not plead factual allegations that plausibly give rise to an entitlement to relief for the alleged breach of the Equal Protection Clause of the Fourteenth Amendment. Accordingly, it is therefore

**ORDERED** that the motion (Doc. No. 8) seeking dismissal of Plaintiff's Complaint in its entirety with prejudice shall be, and is, **GRANTED.**

Dated this ⸱5⁺ʰ day of December 2014.


Alan B. Johnson
United States District Judge

28